[No. B205533. Second Dist., Div. Eight. Mar. 23, 2009.]

MICHAEL A. McCONNELL, Plaintiff and Respondent, v.
INNOVATIVE ARTISTS TALENT AND LITERARY AGENCY, INC.,
Defendant and Appellant.

BEN PRESS, Plaintiff and Respondent, v.
INNOVATIVE ARTISTS TALENT AND LITERARY AGENCY, INC.,
Defendant and Appellant.

COUNSEL

Paul A. Blechner for Defendant and Appellant.

Freedman & Taitelman, Bryan J. Freedman and Gerald L. Greengard for Plaintiff and Respondent Michael A. McConnell.

Lavely & Singer, Martin D. Singer, William J. Briggs II and Brigit K. Connelly for Plaintiff and Respondent Ben Press.

OPINION

O'NEILL, J.*—

## SUMMARY

Two talent agents filed separate lawsuits against the agency that employed them, asserting their employment contracts contained provisions illegal under California law, and seeking a declaration that they had the right to terminate the agreements at will. The following day, the employer responded by having the two agents escorted from the company's office, and by delivering letters to them "temporarily" modifying their job duties and, among other things, instructing them not to come to the office, not to use company e-mail, not to attend any client or industry functions, not to have telephone conversations or communications with clients or other employees, and so on. The next day, the agents' lawyers wrote to the employer, asserting that its conduct constituted constructive termination; the same day, press reports appeared online stating the two agents had launched a new talent agency. The day after that, the employer formally terminated the employment of the two talent agents.

A few weeks later, the agents amended their lawsuits to include causes of action for retaliation and wrongful termination, based on the employer's conduct the day after their lawsuits were filed. The employer responded with a special motion to strike those causes of action under the anti-SLAPP (strategic lawsuit against public participation) statute, asserting the agents' claims arose from the employer's protected First Amendment activity, and that the two agents could not show a probability of prevailing on the claims.

---

*Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The trial court in each case denied the motion, finding the two causes of action did not arise from protected activity. We agree and affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Michael A. McConnell and Ben Press (collectively, McConnell) were employed as talent agents by Innovative Artists Talent and Literary Agency, Inc. (Innovative). Both had employment contracts giving Innovative options to employ them for as long as seven years; Innovative could terminate the contract without cause, but McConnell could not. The contracts also contained provisions preventing McConnell from soliciting Innovative's clients for two years after termination of his employment.

On August 27, 2007, McConnell and Press filed separate lawsuits asserting the same claims. Each of them (1) sought a declaration that he had the right to terminate the employment agreement at will, and (2) alleged that the disputed provisions of the agreement were void as unlawful business practices under the Business and Professions Code and sought an injunction preventing Innovative from enforcing those provisions. Reports of these lawsuits appeared in online versions of the trade press that same evening.

On August 28, 2007, Scott Harris, Innovative's president, ordered McConnell and Press to be escorted from the Innovative offices. Harris, who was out of town at the time, sent each of them a letter headed "New Job Duties." The letter stated that each agent's job duties were "temporarily modified, effective immediately," in 12 numbered particulars. The 12 particulars included instructions:

1. Not to come to the office without Harris's prior consent,

2. Not to use the company e-mail system or log onto the company's network or software,

3. Not to attend any client or any industry functions, not to attend or participate in meetings at the office or in meetings or telephone conversations with any clients,

4. Not to communicate with any of Innovative's clients or their managers, lawyers, publicists, or other representatives, and

5. Not to communicate with any former or current employees of Innovative.

In addition, McConnell and Press were instructed to provide Harris with a list of all scheduled meetings and conferences (and not to make any calls or take any other steps to contact anyone involved in any of the meetings and conferences); to submit to Harris booking slips for any deals they made at Innovative for which booking slips had not previously been prepared; and to prepare written status reports on every client with whom they had been in contact, on any pending deals or negotiations, on all appointments and on all films they had been covering. McConnell and Press were instructed to honor their duties of loyalty and not to compete with Innovative in any manner. The letter also advised McConnell and Press that they remained employees and would continue to be paid their salaries.

On August 29, 2007, Harris received letters from lawyers for McConnell and Press. Counsel asserted that Harris's actions the previous day constituted a constructive termination, and that McConnell and Press were no longer employed by or affiliated with Innovative. That same evening, further reports appeared in the online versions of the Hollywood trade press, stating that McConnell and Press had launched their own talent agency.

On August 30, 2007, Innovative's counsel wrote to counsel for McConnell and Press, terminating them for cause.

On September 17, 2007, McConnell and Press amended the complaints in their lawsuits. They alleged two additional causes of action—for retaliation in violation of Labor Code section 1102.5, and for wrongful termination in violation of public policy—based on Innovative's conduct on August 28, 2007. The amended complaints alleged Innovative took adverse employment actions against them in retaliation for the lawsuits they filed, and engaged in a course of conduct that completely prevented them from performing the functions of their jobs as talent agents; they sought compensatory and punitive damages.

On October 22, 2007, Innovative filed special motions to strike the two additional causes of action under Code of Civil Procedure section 425.16, asserting those causes of action arose out of Innovative's acts in furtherance of its free speech and petition rights, and that McConnell and Press could not show a probability they would prevail on the claims.[1] Innovative's motions were denied by the trial court. In both cases, the trial judge concluded that Innovative did not make the necessary threshold showing that the causes of action arose from protected First Amendment activity.

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise specified.

Innovative filed timely appeals from both orders, and the two appeals were consolidated for purposes of briefing, argument and decision.

## DISCUSSION

An appellate court independently reviews a trial court's ruling on an anti-SLAPP motion. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 [39 Cal.Rptr.3d 516, 128 P.3d 713] (*Rusheen*).) In evaluating the rulings, we first summarize the general legal principles and then discuss their application to this case.

### 1. *The anti-SLAPP statute.*

The governing principles were summarized in *Rusheen, supra,* 37 Cal.4th at pages 1055–1056. A strategic lawsuit against public participation (SLAPP suit) "seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances." (*Id.* at p. 1055.) The anti-SLAPP statute was enacted as "a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional [First Amendment] rights." (*Id.* at pp. 1055–1056.) Thus, under section 425.16, subdivision (b)(1), a defendant may move to strike "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue . . . ." Acts in furtherance of petition or free speech rights are defined to include "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body . . . ."[2] (§ 425.16, subd. (e)(2).) Thus, as *Rusheen* observes, " 'A cause of action "arising from" defendant's litigation activity may appropriately be the subject of a section 425.16 motion to strike.' " (*Rusheen, supra,* 37 Cal.4th at p. 1056.)

In evaluating an anti-SLAPP motion, the trial court first decides whether the defendant has made a threshold showing that the challenged cause of action arises from protected activity, as just described. (*Rusheen, supra,* 37 Cal.4th at p. 1056.) "In deciding whether the initial 'arising from'

---

[2] Subdivision (e)(2) states, in full: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: . . . (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law . . . ." (§ 425.16, subd. (e)(2).) The statute does not require any showing that the litigated matter concerns a matter of public interest. (*Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 35 [64 Cal.Rptr.3d 348]; see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703], quoting § 425.16, subd. (b)(2).) "[T]he critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89.) If the trial court finds the defendant has made that threshold showing, it must then decide whether the plaintiff has demonstrated a probability of prevailing on the claim. To do so, the plaintiff must show the complaint is legally sufficient and " ' "supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Rusheen, supra,* 37 Cal.4th at p. 1056.)

### 2. *McConnell's retaliation and wrongful termination claims do not arise from Innovative's protected activity.*

The question in this case is whether Innovative made the required threshold showing that McConnell's causes of action for wrongful termination and retaliation arose from Innovative's protected litigation activity: specifically, whether those causes of action were based on Innovative's written statements "made in connection with an issue under consideration or review" in McConnell's lawsuit. We conclude no such showing was made or could be made on the facts of this case.

First, as case law confirms, a cause of action does not necessarily arise from protected activity merely because it was filed after the defendant engaged in that activity. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76–77 [124 Cal.Rptr.2d 519, 52 P.3d 695].) *Cotati* tells us: "In short, the statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech." (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78.)

Second, the acts underlying McConnell's claims of retaliation and wrongful termination consisted of a course of conduct by Innovative on August 28 that prevented McConnell and Press from performing their work as talent agents. McConnell's claims do not arise from Harris's letter, but from Harris's action "temporarily modif[ying]" McConnell's and Press's job duties, effectively precluding them from engaging in any of the ordinary activities of a talent agent. The fact that these "modifications" to McConnell's job duties were reduced to writing does not convert them from conduct

affecting the conditions of employment to protected free speech activity. We look to the gravamen of a plaintiff's complaint to see if it is based on a defendant's protected First Amendment activity. (See *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494] ["it is the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies . . ."].) Here, McConnell's causes of action for retaliation and wrongful termination were based on Innovative's conduct effectively eliminating all the normal job duties of a talent agent—as reflected both in Harris's letter and in Innovative's other conduct described in the amended complaints: escorting McConnell and Press from the office, deactivating their e-mail and computer access, and so on.

Third, the existence of the McConnell/Press lawsuits does not mean that any writing Innovative might send thereafter is a "writing made in connection with an issue under consideration or review" in the lawsuits. (§ 425.16, subd. (e)(2).) Thus, even if one could conclude that McConnell's retaliation and wrongful termination claims arose from Harris's letter, and not from his action eliminating virtually all of their job duties, the letter, on its face, was not written in connection with "*an issue under consideration or review* by a . . . judicial body . . . ." (§ 425.16, subd. (e)(2), italics added.) As the court observed in *Paul v. Friedman* (2002) 95 Cal.App.4th 853, 867 [117 Cal.Rptr.2d 82], "it is insufficient to assert that the acts alleged were 'in connection with' an official proceeding. There must be a connection with an issue under review in that proceeding."[3] Here, the lawsuits McConnell and Press filed on August 27, 2007, sought declaratory and injunctive relief establishing that McConnell and Press were legally free to leave Innovative whenever they chose. While the lawsuits undoubtedly precipitated Innovative's conduct the following day, that conduct, including the letter "temporarily modif[ying]" McConnell's job duties, was obviously directed at preventing McConnell from taking clients with him when he left, not at

---

[3] In *Paul v. Friedman*, an attorney moved to strike causes of action asserted by a securities broker, who alleged the attorney, in litigating a prior arbitration proceeding, had conducted an intrusive investigation into the broker's personal life, and had disclosed to others personal details having no bearing on the alleged securities fraud at issue in the arbitration. (*Paul v. Friedman, supra*, 95 Cal.App.4th at pp. 857–858, 866.) The Court of Appeal rejected the attorney's contention that his conduct was protected because it was undertaken " 'in connection with' " the arbitration proceeding. (*Id.* at p. 865.) The court concluded that section 425.16 "does not accord anti-SLAPP protection to suits arising from any act having any connection, however remote, with an official proceeding. The statements or writings in question must occur in connection with 'an issue under consideration or review' in the proceeding." (95 Cal.App.4th at p. 866.) Statements that "ha[ve] nothing to do with the claims under consideration" in the litigation do not meet that standard. (*Ibid.*) So, while the attorney's investigative conduct may have been "in connection with" a proceeding, it was not "in connection with" an issue under review in that proceeding, and therefore was not protected activity under the anti-SLAPP statute. (*Id.* at p. 867.)

establishing that McConnell was legally required to stay. Indeed, the Harris letter on its face says nothing at all about McConnell's lawsuit, and nothing at all about any claims Innovative might make in that lawsuit. Consequently, it is difficult to find any basis to conclude that Innovative's letter was written "in connection with an issue under consideration" in those lawsuits, of which no mention at all was made.

Innovative insists that its letters were written "in connection with an issue under consideration or review" in the McConnell/Press lawsuits, because the letters were written immediately after the lawsuits were filed, and were part of Innovative's "efforts to investigate pending or prospective claims and/or prepare for their potential resolution." In his declaration, Harris asserts he was out of town when the McConnell/Press lawsuits were filed, and "caused [the] written directives to be given" to McConnell and Press because of reports in the trade press about the lawsuit, reports of disruption at the Innovative office, and his "desire to investigate matters further and to speak with McConnell and Press in person upon my return . . . ." But the letters do not mention the lawsuits; do not mention any desire to investigate; do not refer to any misconduct by McConnell and Press; and do not mention "pending or prospective claims" or their "potential resolution." In short, the McConnell/Press causes of action for retaliation and wrongful termination could not have been based on protected litigation activity, in the form of Innovative's investigation of pending claims, when no such investigative activity is reflected in Harris's letter.

Innovative relies on several cases in support of its claim that the trial courts erred in denying its motions, but none of them assists Innovative.

### a. *Neville v. Chudacoff.*

Innovative cites *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255 [73 Cal.Rptr.3d 383] (*Neville*), for the proposition that Harris's letters were written "in connection with" the issues in the McConnell/Press lawsuits. In *Neville*, an employer fired an employee (Neville) amid allegations that Neville misappropriated customer lists to start a competing business. Several months before the employer filed suit against Neville, the employer's attorney sent a letter to the employer's customers, accusing Neville of breach of contract and misappropriation of trade secrets, and suggesting the customers should not do business with the employee, in order to avoid potential involvement in any ensuing litigation. The employer later sued Neville, and Neville cross-complained against the employer and the lawyer for defamation and other causes of action arising from the allegedly false accusations and

statements made to the employer's customers. The lawyer filed a special motion to strike Neville's cross-complaint, arguing the claims against him arose from the letter, which was constitutionally protected petitioning activity. The Court of Appeal agreed, holding that the lawyer's letter to the customers was a writing made " 'in connection with an issue under consideration or review' " by a judicial body, "because the letter directly related to the employer's claims against the employee, and the employer was seriously and in good faith contemplating litigation against the employee." (*Id.* at pp. 1258–1259, 1263 ["communications in connection with anticipated litigation are considered to be ' " 'under consideration or review by a . . . judicial body' " ' "].)

■ We fail to see how *Neville* helps Innovative. In *Neville*, it was undisputed—and indisputable—that Neville's claims against the lawyer arose entirely from the letter (*Neville, supra,* 160 Cal.App.4th at p. 1260 & fn. 4), without which there could have been no defamation claim. Moreover, the letter "directly related to the employer's claims [misappropriation of customer lists and related misconduct] against the employee" (*id.* at p. 1259), which were the subject of the anticipated litigation. Here, by contrast, (1) the retaliation and wrongful discharge claims were based on McConnell's and Press's exclusion from the workplace and the elimination of job duties, not on the letters themselves; and in addition (2) the letters are not "directly related" to McConnell's and Press's suits for declaratory relief, and indeed do not even mention those lawsuits, the issues raised in them, or any misconduct by McConnell or Press. *Neville*'s summary of the precedents is telling: "These cases stand for the proposition that a statement is 'in connection with' litigation under section 425.16, subdivision (e)(2) *if it relates to the substantive issues in the litigation* and is directed to persons having some interest in the litigation." (*Id.* at p. 1266, italics added.) Harris's letters reflect no relationship to the substantive issues in the McConnell/Press lawsuits, which involved whether certain terms in their employment contracts were enforceable.

### b. *Vergos v. McNeal.*

Innovative contends that McConnell's retaliation and wrongful termination causes of action are based on Harris's letters, because "no legitimate distinction" can be made between "the decisions Innovative made about how to conduct its investigation" and the communication of those decisions to McConnell and Press, as "any underlying conduct was meaningless unless and until it was communicated." First, as we have already seen, the letters made no reference to any investigation, lawsuit, misconduct by McConnell and Press, or pending claims. Moreover, the claim that Harris's underlying

conduct "was meaningless unless and until it was communicated" is simply a truism. No employer action has any effect unless it is communicated, but no one would suggest that a statement or writing firing an employee is protected First Amendment activity. A writing, as here, effectively eliminating all job duties is no different. Nor is Innovative assisted by *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387 [53 Cal.Rptr.3d 647] (*Vergos*). In *Vergos*, an employee brought sexual harassment and civil rights claims against his employer (the Regents of the University of California) and against a manager who acted as a hearing officer and denied his administrative grievances. The Court of Appeal concluded the manager's motion to strike the employee's civil rights claim should have been granted, because the employee's cause of action— "which complained of [the manager's] 'hearing, processing, and deciding [his] grievances,' " and the gravamen of which was the manager's "communicative conduct in denying plaintiff's grievances" (*id.* at pp. 1396, 1397)— was protected as a "written or oral statement or writing made in connection with an issue under consideration or review" in an official proceeding.[4] (§ 425.16, subd. (e)(2).) The court's conclusion is unassailable, but of no help to Innovative. While the court did indeed observe, as Innovative points out, that the hearing, processing and deciding of the grievances were "meaningless without a communication of the adverse results" (*Vergos, supra*, 146 Cal.App.4th at p. 1397), the observation has no applicability to Harris's conduct and letter—which were entirely unrelated to any issues under review in the McConnell/Press lawsuits.

### c. *Gallanis-Politis v. Medina.*

Finally, Innovative contends this court's decision in *Gallanis-Politis v. Medina* (2007) 152 Cal.App.4th 600 [61 Cal.Rptr.3d 701] (*Gallanis-Politis*) requires reversal of the rulings of the trial courts. It does not.

In *Gallanis-Politis*, a county employee sued the county for discrimination, and in her third amended complaint, added a retaliation claim and two supervisory employees as defendants on the retaliation claim. She alleged the supervisory employees obstructed her efforts to obtain bilingual bonus pay by conducting a pretextual investigation and preparing a report falsely concluding she was not entitled to bilingual pay. The supervisory employees filed a special motion to strike the retaliation claim. This court agreed the retaliation claim arose from protected activity, as the investigation was conducted and the report was prepared in response to a request from the county's counsel in connection with the employee's discovery requests in the ongoing lawsuit.

---

[4] The Regents' statutory hearing procedures qualified as "any other official proceeding authorized by law" within the meaning of section 425.16, subdivision (e)(2). (*Vergos, supra*, 146 Cal.App.4th at p. 1396.)

(*Gallanis-Politis, supra,* 152 Cal.App.4th at p. 604.) Again, *Gallanis-Politis* simply doesn't help Innovative. In *Gallanis-Politis,* the acts on which the employee's retaliation claim was based, *as expressly alleged in her complaint,* were the allegedly pretextual investigation and false report, conducted and written in response to an information request from counsel. (The other acts the employee alleged were retaliatory—such as restricting her job duties—were conceded by the defendants not to constitute protected activity.) (*Id.* at p. 613.) Here, the McConnell/Press complaints alleged Innovative retaliated against them by taking adverse employment actions, including ordering them escorted from the Innovative offices, forbidding their return, precluding their access to e-mail and computers, forbidding them from attending a staff meeting that day, forbidding them from attending client or industry functions and from communicating with clients and other employees, and so on. Innovative's post hoc attempt to characterize these actions as part of a litigation-related investigation, when Harris's letters themselves make no reference to litigation, claims, or investigations, are necessarily unavailing.

## CONCLUSION

In sum, McConnell's wrongful termination and retaliation claims arise from and are based on Innovative's "temporary modification" of their job duties, which effectively prevented them from engaging in any activity as talent agents. The fact that this modification of their job duties was communicated to them in writing does not convert Innovative's allegedly adverse employment actions into protected First Amendment activity. Nor does the timing of Innovative's conduct—immediately after lawsuits were filed—convert job restrictions into First Amendment activity: a statement or writing is not protected under subdivision (e)(2) of the anti-SLAPP statute (§ 425.16) merely because it was made "in connection with" litigation; it must be "made in connection with an issue under consideration or review" and thus must "relate[] to the substantive issues in the litigation . . . ." (*Neville, supra,* 160 Cal.App.4th at p. 1266; see *Paul v. Friedman, supra,* 95 Cal.App.4th at p. 867.) Of course, it may be that the McConnell/Press claims have no merit at all; Innovative asserts that the facts in their totality show that the claims of constructive discharge are a sham, and that McConnell and Press were covertly working to set up a competing agency. But that is not for us to decide; the only question before us is the threshold question: whether McConnell's and Press's causes of action arose from Innovative's First Amendment activity. They did not, and the motions to strike were therefore properly denied.

## DISPOSITION

The orders are affirmed. Michael A. McConnell and Ben Press are to recover their costs on appeal.

Flier, Acting P. J., and Bigelow, J., concurred.

A petition for a rehearing was denied April 16, 2009.